**IN THE COURT OF COMMON PLEAS**
**FOR LICKING COUNTY**

| | | |
|---|---|---|
| JOHN DOE, | * | |
| | * | JUDGE: |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NO. |
| | * | |
| DENISON UNIVERSITY | * | **JURY DEMAND** |
| c/o/ James Cooper, S.A. | * | **ENDORSED HEREIN** |
| 33 West Main Street | * | |
| Newark, Ohio 43055 | * | *Interrogatories, Request for* |
| | * | *Production of Documents &* |
| and | * | *Request for Admissions are* |
| | * | *Attached Hereto* |
| JANE DOE | * | |
| | * | |
| and | * | |
| | * | |
| MARY-KATHLEEN CLIFFORD | * | |
| 1134 Broadway Avenue | * | |
| Columbus, Ohio 43212 | * | **FIRST AMENDED COMPLAINT** |
| | * | |
| Defendants | * | |

**NATURE OF THE ACTION**

1.  Having been irreparably harmed by false allegations of sexual misconduct, ("John Doe"),[1]

    by and through his attorneys, Eric Rosenberg and Ellen Foell, bring this Complaint against

    (a) Jane Doe ("Jane Doe"); (b) Denison University ("Denison"); and (c) Mary-Kathleen

    Clifford ("Clifford").    Plaintiff's causes of action include: defamation, intentional

    infliction of emotional distress, negligence, breach of contract, quasi contract, promissory

    estoppel, unjust enrichment, and violations of federal law for which this Court has

    jurisdiction.

---

[1] *See generally*, *John Doe's Motion To Allow the Parties to Use Pseudonyms* (containing John Doe's request for using pseudonyms in this proceeding).

2.  For example, Denison violated Title IX by creating a gender biased, hostile environment against males, like John Doe, based in part on Denison's pattern and practice of disciplining male students who accept physical contact initiated by female students. Denison also violated John Doe's rights under The Violence Against Women Act ("VAWA") by prohibiting John Doe from having an attorney present during Denison's investigation of Jane Doe's false accusation that John Doe violated Denison's policies by accepting physical contact initiated by Jane Doe when she was not incapacitated by alcohol or drugs.

3.  In addition, Denison violated Denison's 2014-15 Code of Student Conduct ("CSC") in at least three ways: (1) disciplining John Doe in violation of various provision of the CSC and other Denison policies related to student conduct ("Denison Policies"); (2) failing to apply Denison Policies in a gender neutral fashion; (3) sanctioning the consumption of alcohol by underage students like Jane Doe despite provisions in Denison Policies which prohibit this consumption.

## THE HISTORY BEHIND DENISON'S UNLAWFUL DISCIPLINE OF JOHN DOE

4.  On or about March 7, 2014, Denison became ensnared in an investigation by the United States Department of Education's ("DOE") Office of Civil Rights ("OCR"). *See e.g., Exhibit 1,* (containing DOE's December 10, 2015 response to John Doe's FOIA request). Upon information and belief, this investigation occurred because female student(s) alleged Denison violated Title IX by insufficiently disciplining male students allege to have engaged in sexual misconduct. *Id.* Denison is one of many institutions subject to these types of OCR investigations. *See e.g.,* Nick Anderson, *Tally of Federal Probes of Colleges on Sexual Violence Grows 50 Percent Since May,* WASH POST, Oct. 19. 2014, https://www.washingtonpost.com/local/education/tally-of-federal-probes-of-colleges-on-

sexual-violence-grows-50-percent-since-may/2014/10/19/b253f02e-54aa-11e4-809b-8cc0a295c773_story.html; http://projects.chronicle.com/titleix/cases (containing database of information related DOE's Title IX investigations of colleges and universities since 2011).

5. OCR's investigations primarily involve females alleging the universities they attend condone sexual harassment and/or sexual violence by males.  These complaints by female students have triggered OCR investigations of academic institutions which include, but are not limited to: (i) the University of Virginia; (ii) Southern Methodist University; (iii) Yale University; (iv) George Washington University; (v) Tufts University;  and (vi) the University of Montana in Missoula.  *See generally,* http://www2.ed.gov/documents/press-releases/university-virginia-letter.pdf; (containing OCR's letter to the University of Virginia regarding OCR's Title IX investigation);http://www2.ed.gov/documents/press-releases/southern-methodist-university-letter.pdf; containing OCR's letter to Southern Methodist University regarding OCR's Title IX investigation); http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01112027-a.html (containing OCR's letter to Yale University regarding OCR's Title IX investigation). http://www2.ed.gov/about/offices/list/ocr/docs/investigations/11112079-a.pdf (containing OCR's letter to George Washington University regarding OCR's Title IX investigation). http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01102089-a.html (containing OCR's letter to Tufts University regarding OCR's Title IX investigation).

6. Many academics and organizations have raised alarms that DOE/OCR's worthwhile goal of protecting female college students from sexual misconduct has evolved into an unlawful example of federal governmental overreach which violates the rights of male students who

3

never engaged in misconduct. *See e.g., Open Letter From Sixteen Members of Penn Law School Faculty* (Feb. 17. 2014), http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/02/19/open-letter-from-16-penn-law-school-professors-about-title-ix-and-sexual-assault-complaints/ ("[a]lthough we appreciate the efforts of Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCU's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."); Barclay Sutton Hendrix, *A Feather On One Side, A Brick On The Other: Tilting The Scale Against Males Accused of Sexual Assault In Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, (2013); Stephen Henrick, *A Hostile Environment for Student Defendants*: *Title IX and Sexual Assault on College Campuses,* 40 N. Ky. L. Rev. 49 (2013); *Rethink Harvard's Sexual Harassment Policy,* LETTER TO EDITOR, BOSTON GLOBE, Oct. 15, 2015, http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html; Janet Halley, *Trading the Megaphone for the Gravel Gavel in Title IX Enforcement,* HARV. L. REV. F. 103, 103-17, (2014); Samantha Harris, *Campus Judiciaries on Trial: An Update From the Court,* HERITAGE FOUNDATION, Oct. 6. 2015; http://report.heritage.org/Im165; Janet Napolitano, "*Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault,* Yale Law and Policy Review Volume 33; Issue 2 (2015); Robin Wilson, *Presumed Guilty,* CHRONICLE OF HIGHER EDUCATION (Sept. 3. 2014) http://chronicle.com/article/Presumed-Guilty/148529/?cid=a&utm_medium=en; Reggie D. Yager, *What's Missing From Sexual Assault Prevention and Response,* (April 22, 2015) http: ssrn.com/abstract=2697788.

4

7. As detailed in many of the publications cited in ¶6, OCR's investigations put millions of dollars in federal student aid at risk.  This is because DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a university, such as Denison, did not do enough to discipline males alleged to have engaged in sexual misconduct with female students.

8. For Denison, the withdrawal of federal funding would be catastrophic in part because, upon information and belief,[2] Denison's undergraduate students received $2.3 million in Pell Grants and $6.8 million in Federal Student Loans in 2015.  *See generally* http://nces.ed.gov/collegenavigator/?id=202523#expenses.

9. As detailed in some of the publications cited in ¶6, OCR investigations put immediate and tremendous pressure upon Universities such as Denison to severely discipline male students alleged to have engaged in sexual misconduct regardless of their innocence.

10. Examples of this pressure includes, but is not limited to, DOE/OCR complaints filed by Denison students in February and/or March of 2015.  *See generally, Exhibit 1* (containing DOE/OCR's FOIA response which reference at least two different DOE/OCR case numbers for complaints filed against Denison).    Upon information and belief, female Denison students filed these complaints which alleged Denison subjected females to a sexually hostile environment by failing to severely discipline male students alleged to have engaged in sexual misconduct.  *See e.g., Id.,* p.4 (notifying Denison of DOE/OCR's

---

[2] It should be noted, the "information and belief" allegations in the Complaint are based on at least the following two factors: (1) the evidence referenced and/or exhibits attached to this Complaint which provide a plausible basis for Plaintiff's "information and belief" allegations; and (2) John Doe believes Defendants are in possession and/or control of additional evidence supporting Plaintiff's "information and belief" allegations and John Doe believes he will obtain this evidence in discovery.

investigation regarding a Feb. 19, 2015 complaint filed by a "female student" who alleged a "sexually hostile environment" existed at Denison).

11. Therefore, upon information and belief, pressure from governmental agencies such as OCR/DOE and/or internal forces at Denison, caused Denison to take unlawful and gender biased disciplinary actions against John Doe. Evidence of these unlawful and/or gender biased actions include, but is not limited to, Denison's pattern and practice of taking unlawful disciplinary actions against male students who were falsely accused of sexual misconduct. *See generally, Exhibits 2-6* (containing court filings of male Denison students who alleged Denison unlawfully disciplined them for engaging in sexual misconduct which they did not commit).

12. Based on the information detailed in this Complaint (and) upon information and belief, Defendants' unlawful discipline of John Doe occurred in part because of Defendants' archaic assumptions that female students do not sexually assault their fellow male students.

13. Evidence of governmental pressure exerted upon Denison includes The White House's April 2014 report entitled "Not Alone" which threatens the elimination of federal funds by stating:

> "If OCR finds a Title IX violation, the school risks losing federal funds. In these cases, OCR must first seek to voluntarily resolve the non-compliance before terminating funds. Through this voluntary resolution process, OCR has entered into agreements that require schools to take a number of comprehensive steps to remedy the problem on their campuses." www.whitehouse.gov/sites/default/files/docs/report_0.pdf

14. The White House also noted that:

> "The Justice Department (DOJ) . . . shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools receiving DOJ financial assistance. If schools are found to violate Title IX and

a voluntary resolution cannot be reached, DOJ can . . . seek to terminate DOJ funds." www.whitehouse.gov/sites/default/files/docs/report_0.pdf

15. In response to pressure from the DOE, the DOJ, and/or the White House, educational institutions like Denison are being counseled to severely limit procedural protections afforded male students like John Doe in sexual misconduct cases.  Two groups providing such counseling are: (1) the Association of Title IX Administrators' ("ATIXA"); and (2) the National Center for Higher Education Risk Management ("NCHERM")

16. Denison relies on both ATIXA and NCHERM in addressing allegations of sexual misconduct.  *See e.g., Exhibit 7* (containing May, 7, 2015 email from Title IX Coordinator, Steve Gauger, to John Doe detailing Denison's adoption of ATIXA's definition of incapacitation); *Infra,* ¶36 (discussing Denison's hiring of a NCHERM contractor to investigate Jane Doe's allegations against John Doe).

17. Unfortunately, the facts detailed in this Complaint prove Denison embraces NCHERM's gender bias views against male students alleged to have engaged in sexual misconduct. NCHERM's gender biased views include, but are not limited to, the following:

    a) NCHERM uses the feminine pronouns when referring to the victim of alleged sexual misconduct., *See, Exhibit 41* (containing pages from NCHERM website);

    b) NCHERM uses masculine pronouns when referring to the student accused of perpetrating allegations of sexual misconduct, referring to them as "the usual suspects". *Id.*

    *c)* NCHERM alleges the burden of proof regarding whether a female student consented to sexual contact should be placed on the male student because: "[t]he core of consent is the right of the victim to be unmolested until she gives clear permission for sexual activity to take place-what I call sexual sovereignty." *Id.,*

d) NCHERM's bias in favor of female victims is reflected in an Open Letter from the NCHERM Group which states: ". . . our experience suggests victims tell the truth." *See, Exhibit 40* containing NCHERM's Open Letter)

18. Similarly, the facts detailed in this Complaint prove Denison's Policies explicitly and/or implicitly incorporate and/or embraceATIXA and NCHERM's gender bias and goal of limiting the procedural protections afforded male students like John Doe in sexual misconduct cases. ATIXA and NCHERM's goal regarding these limitations is detailed in part in their "2014 Whitepaper" entitled *Equity Is Such A Lonely Word.* www.ncherm.org/.../2012/01/2014-Whitepaper-FINAL.pdf. This Whitepaper states:

"victims have historically been accorded 3/5 of the rights of an accused individual (or less), and *victims are typically women*, equity may require institutions to recalibrate the pendulum to right the historical imbalance. An equitable process on many campuses will force a victim focus, but only as a casualty of history." (emphasis added).

19. ATIXA's Whitepaper also details OCR's demands that colleges limit the due process rights of males accused of sexual misconduct by stating: (a) "[a] hearing became a panel . . . [t]he panel afforded presumptions of innocence, rights to attorneys, rights to remain silent. Rights, rights, rights. But, we forgot about victims along the way." and (b) OCR's 2011 Dear Colleague Letter "indicated that we must deconstruct part of the due process castle . . . [and ensure the] complainants should be inconvenienced only as far as absolutely required to remedy the discrimination." *Id.,* pages 5, 13-14.

20. Here, Denison's Policies contained in *Exhibits 8-12* prove Denison implemented NCHERM and ATIXA's call to "deconstruct" the rights afforded male students accused of sexual misconduct by detailing Denison's pattern and practice of eliminating due process rights previously provided these students.

21. Moreover, in the midst of OCR's investigation of Denison, Denison Vice President Dr. Laurel Kennedy ("Kennedy") published the April 30, 2014 open letter in *Exhibit 13* which acknowledged Denison adopted ATIXA's call for gender biased prosecutions of male students in response to OCR pressure.   For example, Kennedy's letter stated the:

> "University is dedicated to supporting victims of violence and holding students accountable when they violate our expectations . . . [o]ver the last four years, we have assessed our efforts on a continuing basis against the backdrop of quickly evolving federal compliance expectations. We are proud to have revised policies when we discerned ways of improving, including a significant change last summer in our investigation model and in the ways we support students affected by reported incidents."

22. In addition, on or about January 19, 2015, just two months prior to Jane Doe's false accusations against John Doe, Denison's newly inaugurated President Adam Weinberg ("Weinberg") wrote *Exhibit 14* which contains an open letter to the Denison community stating:

> "Title IX and sexual assault issues will be high priorities this semester. Denison has joined an organization called Culture of Respect (www.cultureofrespect.org), which has developed an excellent assessment tool and a "*blueprint*" for colleges to expand their prevention programs. We have asked CSMART to take the lead on using the *blueprint* at Denison. I would invite interested students to join CSMART." (emphasis added).

Denison's Policies explicitly and/or implicitly incorporate and/or embrace CSMART and/or the Culture of Respect's policies, procedures, and/or guidance.  But, as detailed below, Denison repeatedly violated the "rights" due John Doe under the "blueprint" articulated by the Culture of Respect's website.

23. Moreover, Denison's decision to apply the "blueprint" articulated by the Culture of Respect proves Denison's intent to prosecute male students in a gender biased fashion.  For, the

9

Culture of Respect presumes Denison's female students will be the victims of sexual misconduct perpetrated by their male counterparts in part because:

a) The Culture of Respect suggests colleges should implement "Sex Signals" skits which communicate to male students how "the male actor used physical and psychological coercion to rape" the female actor. *http://cultureofrespect.org/program/sex-signals/*

b) The Culture of Respect contains a link entitled "A Call to Men" which identifies males as the perpetrators of sexual violence against "women and girls." *http://cultureofrespect.org/program/a-call-to-men* .

c) The Culture of Respect maintains 99% of rapists are men and 60% of these men are Caucasian. *http://cultureofrespect.org/the-issue/statistics-at-a-glance/*

d) The Culture of Respect states: "the vast majority of sexual assault victims are women." *Id.*

24. Denison's campaign to portray a large portion of their male students as sexual predators extends far beyond its embrace of the Culture of Respect's gender biased language. It extends to embracing commonly used, albeit incorrect, statistics as to the number of college women purportedly raped. For example, Denison's program coordinator for the Campus Leadership and Involvement Center ("CLIC") Allie Collini's blog states: "One out of four women are sexually assaulted in college . . . I do not think that we as a community feel comfortable talking about sexual assault openly and honestly." *https://blogs.denison.edu/kaleidoscope/allie-colina-de-vivero/*

25. Similarly, Denison quotes the Rape Crisis Center's statement that: "1 out of 6 American women has been the victim of attempted or completed rape . . . ." https://blogs.denison.edu/sexualpolitics/2014/10/27/is-this-real-life-how-private-practice-helps-us-work-through-contemporary-ideologies. And, Denison's Center for Women and Gender Action's publication alleges one in five female college students will be sexually

assaulted.  *Exhibit 15.   See also, Exhibit 16* (containing Denison economics professor Dr. Fadhel Kaboub's retweet of alleged rape statistics on college campuses).

26.     Denison's campaign to portray a large portion of their male students as sexual predators is echoed by President Obama's "It's On Us" campaign which states: "[a]n estimated one in five women has been sexually assaulted during her college years. . . ." https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus;              https://www.whitehouse.gov/the-press-office/2014/04/29/fact-sheet-not-alone-protecting-students-sexual-assault.

27.     According to Denison publications, 55% of its current 2,150 students are female. http://denison.edu/campus/about/fast-facts. Therefore, if the one in five statistic were applicable, 236 female Denison students would be sexually assaulted over their four year stay at Denison.   But, Exhibit 43 proves that during 2012-14 only 17 Denison students alleged they were victims of "sex offenses."

28.     Moreover, Emily Yoffe's 2014 article in *Slate* refutes sexual assault statistics relied on by President Obama and/or Denison.   Emily Yoffe, The College Rape Overcorrection, SLATE,                    December                    7,                    2014, http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html  Ms. Yoffe asked Christopher Krebs - the lead author of the study cited by President Obama - whether his study represented the experience of the approximately 12 million female students in America.  *Id.*  Mr. Krebs stated those involved in the study, "don't think one in five is a nationally representative statistic." *Id.*  This was because Mr. Kreb stated his team's sampling of only two schools "[i]n no way . . .  make[s] our results nationally representative."  *Id.  See also,* Reggie D.

Yager, *What's Missing From Sexual Assault Prevention and Response,* (April 22, 2015) http: ssrn.com/abstract=2697788 (discussing a United States Department of Justice study from 2014 which determined the "rates of sexual assault for college women is 6.1 per 1000 students  . . . ."); Heather Mac Donald, *An Assault on Common Sense,* The Weekly Standard, Nov. 2, 2105, http://www.weeklystandard.com/an-assault-on-common-sense/article/1051200  (detailing why a recent survey conducted by Association of American Universities has been improperly distorted to falsely suggest large percentages of female college students are being sexually assaulted on America's college campuses).

29. Ms. Yoffe also noted that if the "one-fifth to one-quarter assertion [regarding sexual assaults on college campuses were accurate that] would mean that young American college women are raped at a rate similar to women in Congo, where rape has been used as a weapon of war."  Emily Yoffe, The College Rape Overcorrection, SLATE, December 7, 2014,

http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html  And, Ms. Yoffe debunked the sexual assault statistics relied on by President Obama and/or Denison by discussing a:

> "special report from the Bureau of Justice Statistics title 'Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013' . . . [which] found that contrary to frequent assertions by some elected officials, about the particular dangers female college students face, they are less likely to be victims of sexual assault than their peers who are not enrolled in college.  The report found . . . the incidence [of sexual assault] . . . was far lower than anything approaching 1 in 5: 0.76 percent for nonstudents and 0.61 percent for students."  Emily Yoffe, The Problem with Campus Sexual Assault  Surveys, SLATE, Sept. 24, 2015. http://www.slate.com/articles/double_x/doublex/2015/09/aau_campus_sexual_assault_survey_why_such_surveys_don_t_paint_an_accurate.html

30. Denison's legitimate goal of preventing sexual assault is *not* the issue in, nor is it the basis for, this Complaint. Rather, this Complaint addresses Denison's unlawful and/or gender biased discipline of male students like John Doe who have been falsely accused of sexual assault.

31. Denison's unlawful and/or gender bias has created a hostile environment which in turn creates an adverse educational setting in violation of Title IX in part because Denison engages in a pattern and practice of subjecting male students like John Doe to sex stereo-typing discrimination based on unlawful notions of masculinity and femininity. This hostile environment causes innocent males on Denison's campus to be unlawfully disciplined and interferes with males' ability to participate in or benefit from various activities including learning on campus. *See e.g., Exhibits 2-6* (containing court filings of male Denison students who alleged Denison unlawfully disciplined them for engaging in sexual misconduct which they did not commit).

32. Denison demonstrates its unlawful conduct and/or gender bias, in part, by alleging Denison Policies related to sexual assault are gender neutral when, in fact, Denison implements Denison Policies in a gender biased fashion in order to unlawfully discipline males students falsely accused of sexual misconduct.

33. In addition, various Denison administrators and faculty members have evidenced gender bias towards male students alleged to have engaged in sexual misconduct. One example is Kristin Hausman ("Hausman") who is Denison's Director of Resident Housing (and) chair of the first University Conduct Board ("UCB#1") which disciplined John Doe. Evidence of Hausman's gender bias include, but are not limited to:

   (a) Hausman's gender biased off-the-record statements to fellow UCB#1 panel members which included her allegation that UCB#1 needed to weigh

13

the "future of 1000 girls" when adjudicating Jane Doe's claims against John Doe;[3]

    (b)    Hausman's application of pressure on fellow UCB#1 members to impose greater sanctions on John Doe than the sanctions these UCB#1 members sought to impose on John Doe;

    (c)    Hausman's gender biased behavior against John Doe during UCB#1 which included, but was not limited to: (i) her aggressively staring down John Doe during his testimony; (ii) smiling and laughing during the UCB#1 as if to trivialize John Doe's testimony; and (iii) hindering John Doe's ability to cross-examine Clifford during UCB#1;

    (d)    Hausman's history of exhibiting gender bias against male students alleged to have engaged in sexual misconduct.  *See e.g., Exhibit 6,* p.21-28 (containing the court filing of a male Denison student which details Hausman's bias against the male student); and

    (e)    Hausman's taking of President Obama's "It's On Us" pledge (https://twitter.com/KRHausman) which seeks the aggressive prosecution of male students alleged to have engaged in sexual misconduct.  *See generally, http://itsonus.org/index.html#pledge*

34.    Hausman's "It's On Us" pledge is related to the national "It's On Us" campaign to protect female students from male students via statements such as:

    a)    Stating: "It's on us to make sure *guys* know that if *she* doesn't or can't consent to sex, it's sexual assault." https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CCMQFjABahUKEwjW2vihqpbJAhUI02MKHeaeC94&url=http%3A%2F%2Fitsonus.org%2Fassets%2Ffiles%2FIt%27s_On_Us_Organizing_Guide_Fall_2015.pdf&usg=AFQjCNGy24MM2vn7-N7HwwUnshc6d6q0gQ&sig2=nlpOPMfxwODg7eSMWYrbxA&cad=rja, pg. 11 (emphasis added);

    b)    Suggesting individuals videotape themselves "[s]ay[ing] to camera…it's on us to recognize that if a *woman* doesn't or can't consent to sex, it's rape." *Id.,* pg. 14 (emphasis added);

---

[3] The source of this statement wishes to remain anonymous because of fears of retaliation by Denison's administration.

c) Stating: "*Never* blame the victim," "*always* be on the side of the survivor," and "*trust* the survivor." *Id.,* pg.26 (emphasis added);[4]

d) Vice President Joseph Biden's statement that those that make their rape allegations public "give millions of women hope." https://twitter.com/ItsOnUs; and

e) President Barack Obama's statement on International Day for the Elimination of Violence Against Women that: "…together we can change our culture for the better by ending violence against *women and girls*…IT'S ON US…" ; *Exhibit 17* (containing page from It's On Us Facebook page) (emphasis added).

35. Based on the aforementioned facts, Hausman should have recused herself from UCB#1 in part because her gender bias violates Weinstein's adoption of the "blueprint" from the Culture of Respect's website.  This is because this "blueprint" states John Doe had a "right" to "an investigation conducted by individuals . . . who do not have a conflict of interest or bias for or against . . . the accused student."  *See,* http://cultureofrespect.org/legal-issues/for-students).

36. Another example of the Denison's gender bias includes its selection of Defendant Katie Clifford ("Clifford") - an affiliated consultant of NCHERM – to conduct the gender biased investigation of John Doe detailed below.  *See e.g., Exhibit 18* (containing NCHERM's profile of Clifford).

### JOHN DOE'S ENROLLMENT AT DENSION AND INTERACTIONS WITH JANE DOE

---

[4] It should be noted, academic studies suggest a substantial percentage of sexual assault allegations are false.  *See e.g.,* Reggie D. Yager, *What's Missing From Sexual Assault Prevention and Response,* (April 22, 2015), pgs.46-62 http: ssrn.com/abstract=2697788.   The rationale behind many of these false allegations of sexual assault are: (i) the need for a cover story or alibi; (ii) retribution for a real or perceived wrong, rejection or betrayal; (iii) desire to gain sympathy or attention; or (iv) extortion.  *Id.,* p.63-65.

37.    John Doe is from Ohio where he worked diligently in high school, graduated with a good academic record (3.7/4.0) and scored in the top percentiles on the SAT (1600), a standardized college entrance examination.

38.    Setting his sights on a college education from a top ranked college, John Doe was excited to accept an offer to attend Denison. John Doe began his studies in the fall of 2012, having received the Denison Scholarship Award, Denison Grant, the Denison Alumni Award and the Bookstore Grant amounting to over 60% of the Denison tuition.

39.    John Doe was a student at Denison until Denison unlawfully expelled him on July 8, 2015.

40.    Defendant Jane Doe, upon information and belief, is currently enrolled as a junior at Denison and living on Denison's campus in Granville Ohio.

41.    Jane Doe was younger than the minimum age for consumption of alcohol at all times relevant to the events described in the Complaint.

42.    While at Denison, John Doe socialized with Jane Doe on several occasions. On one occasion, on or about September 11, 2014, Jane Doe and John Doe went to his dorm room to "make out" and have sexual intercourse.  Jane Doe became ill and told John Doe she wanted to go back to her dorm room. Jane Doe and John Doe did not engage in any sexual activity (and) John Doe walked Jane Doe back to her dorm.

43.    From September 11, 2014 through the morning of February 14, 2015, John Doe and Jane Doe occasionally saw each other at parties and hung out together on occasions.

44.    On the evening of February 13, 2015, John Doe and Jane Doe started texting each other about getting together in the early morning hours of February 14, 2015. *Exhibit 19,* pp. 36-38 (containing text messages between Jane Doe and John Doe).

45.     Throughout the evening of February 13, Jane Doe attended approximately four or five parties across campus while John Doe remained largely in his dorm room.

46.     During the evening of February 13, Jane Doe kept John Doe apprised of her locations and activities by text and told John Doe that she planned to come to his room later. *Id.,* pp. 36-39.

47.     At about 1:00 a.m. on February 14, 2015, Jane Doe attended a FIJI fraternity party held on Denison's campus.  Jane Doe later told Clifford that Jane Doe and her friend entered the party and grabbed an unopened beer.  During the party, a male student – known as "Man Bun" - approached Jane Doe and switched her beer with an opened beer. This male student later took the beer he gave Jane Doe away while stating: "I only fuck with freshman." *See, Exhibit 20*, pgs. 10 and 11 (containing Clifford's Report).

48.     Just prior to leaving the FIJI party, Jane Doe's friend Ciara asked Jane Doe if she was "okay to get home" without Ciara and Jane Doe responded she was fine.  *Id*. and p. 36.

49.     Jane Doe also told Clifford about her conversations with John Doe's friend Sam ("Sam") and how she had been texting John Doe on Feb. 13 and 14.  *Id.,* p. 11.  In fact, one of Jane Doe's texts to John Doe references that "Sam said I should come." *Exhibit 19,* p. 40-41.

50.     Sam told Clifford how Jane Doe approached Sam at a campus party and asked whether Jane Doe should "hook up" with John Doe.  Sam also told Clifford that Jane Doe "did not seem drunk" and "was not falling down, stumbling or throwing up."  *Exhibit 20,* p. 43. Further, Sam told Clifford that Jane Doe was "openly discussing sexual topics and asking advice about hooking up with" John Doe.   *Id. See also, Exhibit 21* (containing Sam's Affidavit presented to Denison during John Doe's internal appeal).

51. Sam's comments about Jane Doe's not stumbling, not falling, and not appearing too drunk are critical, in part, because Sam was the second to the last person to be with Jane Doe before she arrived at John Doe's dormitory.

52. Based on witness testimony, Clifford concluded Jane Doe left the FIJI party at approximately 2:30 am, one and a half hours after she had arrived. *Exhibit 20,* pg. 11.

53. Clifford also concluded Jane Doe's texts demonstrated she arrived at the back door of John Doe's dormitory at approximately 2:41 a.m. *Id.*

54. Upon arriving in John Doe's room, Jane Doe voluntarily started to undress herself and initiated sexual activity with John Doe which included John Doe using his hand to give Jane Doe an orgasm by massaging her clitoris. *Id.*, p.19.

55. After Jane Doe had an orgasm, she asked John Doe why he stopped. *Id.* During the ensuing conversation, John Doe suggested Jane Doe perform oral sex on him. *Id.,* pg. 20  Jane Doe stated she would rather have sexual intercourse and asked John Doe to get a condom. *Id.* But, John was not able to maintain an erection to the dismay of Jane Doe, who insisted John Doe's erection difficulties were her fault.   *Id., See also, Exhibit 19*, p.31, 32 (containing Jane Doe's February 15, 2015 text to John Doe).

56. Sometime later on February 14th, while Jane Doe was in the bathroom of her dorm, she told an unidentified Denison SHARE (Sexual Harassment and Rape Education) advocate that she felt sick even though she had not consumed that much alcohol the night before.  This SHARE advocate suggested someone put a date rape drug in Jane Doe's drink at the FIJI party.

57. According to *Exhibit 22* - which contains a SHARE/CSMART brochure -  Denison's SHARE advocates are trained to help people who allege sexual misconduct by referring

them to supportive services and recommending immediate medical attention so as to preserve evidence.   For instance, SHARE advocates are trained "to provide peer support . . .  and resources to survivors of sexual harassment" which include "information and resources about . . .  the local police, the Licking Memorial Hospital's policy on reporting sexual assault, *the medical collection of evidence….*"  *Exhibit 22,* pg.2.

58.   Upon information and belief, the SHARE advocate followed her training and recommended Jane Doe seek medical treatment to evaluate the presence of any date rape drug like GHB.

59.   After receiving the SHARE advocate's suggestion regarding someone putting a date rape drug in Jane Doe's drink at the FIJI party, Jane Doe began researching symptoms of GHB. (*Exhibit 20*, pg. 14).

60.   No one has alleged John Doe was involved in Jane Doe's alleged ingestion of GHB.  *Id.* In fact, John Doe had no knowledge of Jane Doe's GHB allegations until he received her text message during the evening of February 14th.   In this text exchange, Jane Doe alleges someone put something into her drink.  *Exhibit 19,* pg. 28.  In response, John Doe writes: "I didn't know that, well are you ok and all? You seemed really okay last night so I'm a little shocked…"  *Id.*

61.   John Doe was justifiably "shocked" because none of the witnesses interviewed by Clifford reported: (a) seeing someone slip GHB into Jane Doe's drink; or (b) observing Jane Doe exhibit the following symptoms of GHB  detailed on Mayo Clinic's website:

    1.   Hallucinations

    2.   Paranoia

    3.   Dilated pupils

4. Chills and sweating

5. Involuntary shaking (tremors)

6. Behavior changes

7. Muscle cramping and teeth clenching

8. Reduced inhibitions

9. Heightened or altered sense of sight, sound and taste

10. Decreased coordination

11. Poor judgment

12. Memory problems or loss of memory

13. Reduced consciousness

14. Increased or decreased heart rate and blood pressure."
    http://www.mayoclinic.org/diseases-conditions/drug-addiction/basics/symptoms/CON-20020970).

62. Nevertheless, Jane Doe started alleging to others that someone gave her GHB at the FIJI party discussed in ¶47. For example, Jane Doe told a Denison "Standards' Chair" that someone drugged Jane Doe at the FIJI mixer (and) that her sorority sisters should be warned to watch for open drinks at an upcoming FIJI mixer. *Exhibit 20,* pp. 15 & 16. As a result, the mixer was cancelled. *Id.*

63. After the mixer was cancelled, FIJI members and the male student "Man Bun" began retaliating against Jane Doe for spreading the false rumor about her being drugged at the FIJI mixer. *Id.* Clifford advised UCB#1 that as a result of this retaliation, Jane Doe filed a complaint against John Doe in April of 2015 which contained Jane Doe's false allegations that John Doe engaged in sexual misconduct.

64.     Upon information and belief, neither Clifford nor Denison believed Jane Doe's claim that

"Man Bun" administered GHB to Jane Doe.   Evidence supporting this belief includes, but

are not limited to:

   a) Clifford failed to identity "Man Bun" even though Jane Doe told Clifford
      that he was allegedly putting GHB into drinks at Denison parties so he could
      "fuck freshman";

   b) Clifford told UCB#1 that the identity of "Man Bun" was "irrelevant" to
      Clifford's investigation;

   c) Clifford advised UCB#1 that Title IX Coordinator, Steve Gauger ("Gauger")
      decided not to identify and/or discipline "Man Bun" even though Jane Doe
      alleged he gave her GHB.

65.     Upon information and belief, neither Clifford nor Denison believed Jane Doe's allegation

that ten minutes after allegedly ingesting GHB that something "hit" Jane Doe and she did

not "remember much of the evening after that point in time." *Exhibit 20* p. 28.  Evidence

supporting this belief includes, but is not limited to, the following statements Jane Doe

made to Clifford and/or Denison's employees:

   a. Jane Doe recalls that after making out with John Doe she got dressed and walked
      back to her dorm room.  *Exhibit 20,* pg.12;

   b. Jane Doe remembers John Doe had difficulty maintaining an erect penis when they
      were making out.  *Exhibit 19,* p.31 & 32;

   c. Jane Doe recalls that prior to John Doe's erection difficulties, she and John Doe
      had been "mak[ing] out" in his dorm room. *Exhibit 20,* p.12;

   d. Jane Doe remembers that the hat she was wearing hit John Doe in the head when
      they were kissing.  *Id.*;

   e. Jane Doe recalls she and John Doe talked for a while on the couch in his dorm room
      prior to making out. *Id.;*

   f. Prior to sitting on the couch, Jane Doe remembers she and John Doe checked the
      various rooms in his suite to confirm his roommates were not present. *Id.*;

21

g.  Jane Doe recalls walking up the stairs of John Doe's dorm and telling John Doe that she was tired. *Id.;*

h.  Jane Doe remembers: (i) grabbing her coat at the FIJI party, (ii) leaving the party with the intent of going to John Doe's dorm,  and (iii) and arriving at John Doe's dorm. *Id.,* pg. 11;

i.  Jane Doe recalls: (i) her friend Ciara telling Jane Doe that Ciara was leaving the FIJI party, (ii) Ciara asking Jane Doe was okay to walk home, and (iii) Jane Doe telling Ciara she was "okay" and that she did not need anyone to walk her home. *Id.,* and pg 43*;*

j.  Jane Doe remembers: (ii) seeing John Doe's friend Sam at the FIJI party, (ii)  asking Sam if he knew John Doe, (iii) telling Sam that Jane Doe and John Doe has been texting each other about getting together later that night; and (iv) Sam telling Jane Doe that she should give John Doe a chance.  *Id.* pg. 11.

## <u>DENISON'S UNLAWFUL DISCIPLINE OF JOHN DOE</u>

66.  On or about April 6, 2015, Gauger: (a) interrogated John Doe regarding allegations that he engaged in sexual misconduct with Jane Doe; (b) demanded John Doe provide copies of his text messages with Jane Doe; and (c) notified John Doe that he could have no contact with Jane Doe.  In doing so, Gauger violated John Doe's rights under the Violence Against Women Act ("VAWA") by not informing John Doe that he had a right to have an advisor of his choice present when he talked to Gauger.   Specifically, Gauger violated the following provision of VAWA's provision:

 "the accuser and the accused are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice;" *Sec. 304. Campus Sexual Violence, Domestic Violence, Dating, Violence, and Stalking Education and Prevention. VAWA.*

67. Gauger's failure to notify John Doe of his right to be represented by an attorney during Denison's disciplinary process also violated the following directives contained in the Federal Register:

> "At the outset of the discussion of this issue, the Department made clear that its interpretation of the statutory language was that the accused and the accuser are entitled to an advisor of their choice, including an attorney . . . § 668.46(k)(2)(iii). . . provide[s] that the institution cannot limit the choice or presence of advisor for either the accuser or the accused in any meeting or institutional disciplinary proceeding." *https://www.federalregister.gov/articles/2014/10/20/2014-24284/violence-against-women-act*.

68. In addition, the Culture of Respect's website – Denison's "blueprint" for conducting investigations of sexual misconduct – gave John Doe the right to have an attorney present during Denison's disciplinary process by stating John Doe had a "right":

> "to have an advocate of your choice, who may be an attorney, present with you at all phases of the investigation and adjudicatory process. Your school may limit the extent to which the advocate can speak and participate, but any limit imposed on your advocate must be imposed equally on the accused student's advocate." *https://cultureofrespect.org/legal-issues/for-students/*

69. Nevertheless, Denison repeatedly denied John Doe's request to have an attorney present during the various meetings and hearings conducted by Denison to address Jane Doe's false allegations against John Doe.

70. Denison erected additional unlawful roadblocks to John Doe's defense such as Gauger's April 9, 2015, communication with John Doe contained in *Exhibit 39*. This communication informed John Doe that he was under investigation by Denison (and) prohibited John Doe from gathering evidence and testimony to defend himself by stating:

> "[w]e expect you to keep the investigation and content of our communications confidential. This means that you should not talk about the investigation, or the statements you make during the interview, with your colleagues, other university students and employees." *Id.*pg. 1

71.  Since Denison crippled John Doe's ability to gather evidence and testimony to defend himself, he was forced to rely on Clifford to engage in an unbiased investigation.  But, as detailed in this Complaint, Clifford's investigation and testimony to UCB#1 evidenced her gender bias against John Doe.

72.  For example, Clifford's unlawful and/or gender biased conduct included, but was not limited to, her UCB#1 testimony regarding GHB which she alleged caused "behaviors" commonly associated with individuals operating under the influence of alcohol or marijuana.

73.  Clifford knew or should have known her testimony regarding GHB was false in part because the Mayo Clinic's website – Clifford's "go to" source for information – identified GHB symptoms far more debilitating than mere alcohol intoxication and/or being high on marijuana.  *Supra,* ¶61 (containing the Mayo Clinic's website findings regarding GHB symptoms).

74.  In addition, instead of informing the UCB#1 that none of the witnesses Clifford interviewed provided testimony suggesting Jane Doe manifested the Mayo Clinic's GHB symptoms, Clifford inaccurately testified that Jane Doe's alleged memory loss could have been caused by GHB.

75.  Similarly, instead of discussing the contradictions inherent in Jane Doe's selective memory loss detailed in ¶65 above, Clifford falsely claimed Jane Doe's alleged "poor coordination" suggested someone covertly gave Jane Doe GHB.   Clifford's allegation lacked merit in part because: (a) a student named Louie - who accompanied Jane Doe when she was walking to John Doe's dorm - reported Jane Doe was walking deliberately and not

stumbling; and (b) Sam's testimony that Jane Doe "did not seem drunk" and "was not falling down, stumbling or throwing up." *See generally, Exhibit 20,* pgs. 31 and 37; *Exhibit 21,* and *Exhibit 23.*

76. Clifford's unlawful and/or gender biased conduct also includes, but is not limited to, her failure to address Jane Doe's GHB allegations via ATIXA's definition of "incapacitation" which governed Denison's inquiry into whether Jane Doe's interactions with John Doe should be deemed consensual.

77. Initially, Denison did not inform John Doe that ATIXA's definition of "incapacitation" governed Denison's inquiry into whether Jane Doe's interactions with John Doe were consensual.  Instead, Clifford cited Denison's 2014-15 Policy on Sexual Assault and Other Sexual Misconduct located in *Exhibit 12*.  *See generally, Exhibit 20,* pg. 6.  This policy defines consent as follows:

> "Consent shall be defined as a freely and affirmatively communicated willingness to participate in sexual activity, expressed either by words or actions. Consent may never be obtained through the use of force, coercion or intimidation, or if the victim is mentally or physically disabled or *incapacitated*, including through the use of drugs or alcohol. The existence of a dating relationship between the persons involved or of a past sexual relationship should never provide the basis for an assumption of consent." *Exhibit 12,* pg.1 (emphasis added).

78. During UCB#1, confusion developed over how UCB#1 should define the term "incapacitation" in part because Clifford's Report used the term 21 times.  *See generally, Exhibit 20.*  In response to questions about how to define the term, Clifford did not direct UCB#1 members to ATIXA's definition of "incapacitation.  Instead, Clifford falsely alleged incapacitation defies definition because it is "not a black or white" term.

79. After the UCB#1 hearing, John Doe realized Clifford's Report and UCB#1 testimony regarding incapacitation evidenced gender bias. So, John Doe asked Gauger to provide

Denison's definition of the term. In response, Gauger provided John Doe with *Exhibit 7* which stated Denison and Clifford utilized ATIXA's definition of incapacitation which is:

> "[i]ncapacitation is a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the *'who, what, when, where, why or how'* of their sexual interactions. Sexual activity with someone who knows to be – or based on the circumstances should reasonably have known to be – mentally or physically incapacitated (by alcohol or other drug use, unconsciousness, or blackout), constitutes a sexual misconduct violation. *An incapacitation analysis applies a reasonable person standard*." *Exhibit 7* (containing Gauger's May 7, 2015 email to John Doe and Jane Doe)(internal footnotes to ATIXA's definition of incapacitation omitted)(emphasis added).

80. As detailed above in part in ¶65 above, Clifford and UCB#1 clearly knew or should have known Jane Doe recalled the "who, what, when, where, why or how" of her sexual interactions with John Doe. Therefore, Clifford's UCB#1 testimony and UCB#1 proposed discipline of John Doe unlawfully applied Denison's definition of incapacitation.

81. Moreover, because John Doe did not receive *Exhibit 7* until May 7, 2015 – the day after UCB#1 recommended John Doe be permanently expelled from Denison - Denison prejudiced John Doe's defense by unlawfully withholding Denison's definition of incapacitation.

82. Clifford's Report and UCB#1 testimony also evidenced gender bias by failing to illuminate incapacitation issues addressed in ATIXA's Tip of the Week contained in *Exhibit 24*. This tip discussed how five colleges "got it completely wrong" in finding male students responsible for "hook-ups" when alcohol was involved. *Id.* p. 1. Specifically, ATIXA expressed concerns that these colleges are making "Title IX Plaintiffs" of the students who were wrongly accused (and) noted:

> "*A common policy problem comes from failing to distinguish between intoxicated and incapacitated*. Yet, the most serious issue comes from failing to

implement a mens rea, if you will, within the definition. Certainly, criminal concepts like mens rea are not strictly applicable to the campus conduct process, but if we agree as I stated above that having sex with a willing, yet intoxicated person is not an offense, *there must be something that the respondent does, beyond having sex, that makes a lawful act (sex) into a policy violation . . . there has to be something more than an intent to have sex to make this an offense. Otherwise, men are simply being punished for having sex, which is gender discrimination under Title IX, because their partners are having sex too and are not being subject to the code of conduct for doing so*. Without a knowledge standard, a respondent will suffer an arbitrary and capricious application of the college's rules." *Id.* (*emphasis added*).

83.     Evidence of Denison and/or Clifford's unlawful and/or gender biased conduct also includes

their violation of OCR directives which include, but are not limited to:

a)  "Public and state-supported schools must provide due process to the alleged perpetrator" *U.S. Dep*'t Of Education Office of Civil Rights, *Dear Colleague Letter,* (Apr. 4. 2011); http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html

b)  Denison and/or Clifford must employ "[p]rocedures that . . . will lead to sound and supportable decisions." *U.S. Dep*'t Of Education Office of Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties* (Jan. 2001); http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf; and

c)  "Investigations must be adequate, reliable and impartial, including the opportunity for both parties to present witnesses and other evidence." *Id.*

84.     In addition, Denison's gender bias included Denison's decision to deprive John Doe the

opportunity to question Jane Doe when she provided testimony during UCB#1 even

though the CSC gave John Doe the right to question witnesses. *See generally, Exhibits

11-12.,*

85.     Denison's gender bias included Denison's decision to prohibit John Doe from presenting

character witnesses testimony at UCB#1 even though Jane Doe was permitted to present

such testimony.

27

86.    John Doe raised many of the aforementioned examples of gender bias in his timely appeal of UCB#1 decision contained in *Exhibit 25*.

87.    Denison's Policies required John Doe's appeal be granted because the appeal outlined errors in UCB#1's decision.   Nevertheless, on or about May 28, 2015, John Doe received *Exhibit 26* from Kennedy which merely admitted Denison engaged in a "procedural irregularity."   As a result, *Exhibit 26* advised John Doe that Denison would empanel a second UCB ("UCB#2") for purposes of considering the sanction imposed on John Doe.

88.    Although Denison refused John Doe's request to identify Denison's "procedural irregularity," this irregularity likely involved Denison's violation of John Doe's FERPA rights.  This violation occurred when UCB#1 enhanced its sanction against John Doe based on FERPA protected information from an unrelated event of which John Doe was found "not responsible."

89.    On June 9, 2015, Denison's Dean of Student Bill Fox ("Fox") provided *Exhibit 27* to John Doe which stated UCB #2 would convene on June 16, 2015 to consider the sanction imposed by UCB#1. *Exhibit 27* (containing Bill Fox's June 9, 2015 email to John Doe). *Exhibit 27* stated John Doe was to be given "much latitude … to offer a statement or other information relative to the board's charge of determining the sanction."   Yet, when John Doe offered an opening statement, Board Chair Bill Fox told the Board to strike John Doe's opening statements.

90.    The empaneling of UCB#2 violated the CSC which states the UCB that makes a "responsibility" determination is also responsible for making sanctions recommendations to Denison's Office of Student Conduct ("OSC").   *See generally, Exhibit 11,* p.11

(containing the CSC's mandates regarding how disciplinary sanctions are imposed on students).

91. Denison's gender bias conduct during UCB#2 included, but was not limited to, depriving John Doe of the opportunity to question Jane Doe when she provided testimony during UCB#2 even though the CSC allowed John Doe to question witnesses such as Jane Doe.

92. Denison's gender bias conduct during UCB#2 included, but was not limited to, violating the CSC by limiting John Doe access to Jane Doe's "impact statement" which UCB#2 considered in sanctioning John Doe.

93. John Doe's written statement to UCB#2 – contained in *Exhibit 28* - disclosed why UCB#2 should impose no sanction against John Doe in part because of errors committed by UCB#1. These errors included, but were not limited to Denison's violation of ATIXA's "Tip of the Week" discussed in ¶82 above. *See generally, Exhibit 28* (containing John Doe's written statement to UCB#2).

94. John Doe's UCB#2 statement in *Exhibit 28* also demonstrated how Denison's gender bias caused John Doe to be unlawfully found responsible for sexual misconduct. Nevertheless, UCB#2 ignored UCB#1's unlawful and gender biased actions and re-imposed UCB#1's expulsion sanction. *See generally, Exhibit 29* (containing UCB#2's findings).

95. On or about June 22, 2015, John Doe provided *Exhibit 30* to Denison which timely appealed the decisions of UCB#1 and UCB#2 to Denison's University Appeals Board ("UAB").

96. On or about July 1, 2015, John Doe provided *Exhibit 31* to Kennedy which requested UAB board chair - Dr. Rebecca Kennedy – be excluded from the UAB because of her: (a) academic publications; and (b) position as Interim Director of Women's Studies suggested

29

gender bias.  *Exhibit 31* (containing John Doe's July 1, 2015 email to Kennedy).  For example, John Doe noted concerns with Dr. Kennedy's publications which included: (a) *Legal And 'Sub-Legal' Violence Against Metic Women In Classical Athens*; and (b) *Sexual Servitude or Domestic Partnership*.  *Id.*

97.    John Doe also sent *Exhibit 32* to Kennedy which contains specific passages from Dr. Kennedy's publications that suggested gender bias.  *Exhibit 32* discussed gender bias concerns related to Dr. Kennedy's election to the steering committee of an international organization founded "to *foster feminist* and *gender-informed* perspectives . . .  and to advance the goals of equality and diversity within the profession."  *Id.* (emphasis added).

98.    Despite the gender bias evidence in *Exhibits 31* and *32*, Kennedy dismissed John Doe's gender bias concerns regarding Dr. Kennedy and allowed her to chair John Doe's UAB.

99.    The contents of John Doe's appeal to UAB necessitated a finding that John Doe did not violate Denison's Policies.  Nevertheless, UAB, driven by gender bias against male students like John Doe, unlawfully affirmed the decisions of UCB#2 and/or UCB#1.  *See generally, Exhibit 33* (containing UAB's July 8, 2015 decision).

100.    On or about July 16 and 23, 2015, John Doe timely appealed UAB's decision by sending *Exhibits 34*, *34a & 34b* to Weinberg and Kennedy.

101.    On July 27, 2015, Weinberg sent John Doe *Exhibit 35* which unlawfully rejected John Doe's appeal stating: "we believe our process and the resulting decision were both fair and lawful."

102.    Clifford and/or Denison's employees and/or agents detailed above knowingly participated in the unlawful and/or gender biased discipline of John Doe in part because these individuals knew or should have known the following facts proved beyond a reasonable

doubt that Jane Doe *initiated* physical contact with John Doe when Jane Doe was *not incapacitated* by alcohol or drugs.

    a.   Jane Doe's own testimony disproved any GHB allegation in part because she explicitly recalled 10 different events that occurred at the FIJI party, on her way to John Doe's dorm, and/or in John Doe's dorm  - including the fact that John Doe could not maintain an erection.  *See generally, Supra,* ¶65.

    b.   Jane Doe's witness, Kirsten told Clifford that when Kirsten left Jane Doe at the FIJI party that Jane Doe "seemed OK, she was dancing with Ciara."  *Exhibit 20* pg. 24;

    c.   Louis told Clifford that at approximately 3:00 a.m. when he saw Jane Doe walking to Sawyer, she did not appear to be stumbling or intoxicated to the point of inability to converse or walk.  *Id.,* p.31.  *See also, Exhibit 23* (containing Louis' affidavit);

    d.   Sam informed Clifford that Jane Doe approached him at the FIJI party and asked if she should "hook up" with John Doe – to which Sam told her yes.  *Exhibit 20,* pg. 37.

    e.   Sam told Clifford that he left the FIJI party with Jane Doe (and) reported Jane Doe was not falling down, stumbling or throwing up. *Id. See also, Exhibit 21* (containing Sam Mason's affidavit);

    f.   John Doe informed Clifford that when he first encountered Jane Doe on February 14th that she ". . . . didn't seem drunk . . . [and] was not talking to fast or too slow, and the conversation did not seem delayed." *Id. at* pg. 18;

    g.   John told Clifford how Jane Doe voluntarily "took off her boots, then stood up and took off her pants" and "took his middle finger and placed it on her clitoris" – telling John Doe "not to stop" massaging her clitoris.  *Id. at* pg. 19 and;

    h.   John Doe informed Clifford that after Jane Doe had an orgasm she took John Doe's pants off, told John Doe to get a condom, and blamed herself when he could not maintain a full erection.  *Id.*at pg. 20.

103.   Therefore, as detailed above, Denison and/or Clifford's gender biased and/or unlawful investigation of John Doe subjected him to arbitrary and capricious discipline in violation of Title IX, FERPA, and VAWA. Denison's Policies explicitly and/or implicitly promise

to afford John Doe the legal rights and protections articulated in Title IX, FERPA, and VAWA.

104.   Upon information and belief, Denison engaged in unlawful and/or gender biased conduct in failing to subject Jane Doe to discipline for her underage consumption of alcohol even though Denison's Medical Amnesty Policy did not immunize Jane Doe from discipline since Denison knew or should have known Jane Doe's allegations against John Doe were false.

105.   Upon information and belief, Denison has not disciplined female student(s) when male student(s) allege these female student(s) engaged in sexual misconduct with the male student(s).

106.   After being unlawfully disciplined, John Doe attempted to gain acceptance to a university of Denison's caliber.  For example, John Doe sought enrollment at John Carroll University ("JCU") in Cleveland. *See generally, Exhibits 36 and 37* (containing John Doe's communications with JCU).  But, JCU rejected John Doe's application because of Denison's aforementioned unlawful discipline of John Doe.

107.   As a result of Denison and Clifford's actions (and) the malicious, slanderous and defamatory accusations made by Jane Doe, John Doe suffered and will continue to severe emotional and mental suffering, anxiety and humiliation.  Denison, Clifford and Jane Doe's actions have also irreparably harmed John Doe's opportunity to continue his higher education and/or find employment in the future.

108.   The conduct of Clifford and/or Denison's employees and agents detailed above created an unlawfully hostile and/or abusive environment at Denison for male students like John Doe. *See e.g., Mallory v. Ohio Univ.,* 76 F. App'x. 634, 639-40 (6th Cir. 2003)(setting forth the

elements of at Title IX claim); *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994) (rejecting a motion to dismiss Title IX claim filed by a male student alleging he was falsely accused of sexual assault in part because ". . . . statements by pertinent university officials, or patterns of decision-making that . . . tend to show the influence of gender."); *Zamora v. v. Erskine Coll*., 2006 U.S. Dist. LEXIS 35780, *32-38 (Greenwood Div., N.C. May 25, 2006)(rejecting a motion for summary judgment in a Title IX claim where "a jury issue" was created with regards to "whether [the college] was deliberately indifferent" to Title IX discrimination);  Doe v. Bd. of Educ., 982 F. Supp. 2d 641, 652 (D. Md. 2012)(stating "severe or pervasive" harm can occur when Title IX plaintiff suffers "humiliat[ion]  . . . serious anxiety, fear, or discomfort . . . .")(citations omitted); *Wells v. Xavier Univ*., 7 F. Supp. 3d 746 (S.D. Ohio 2014)(rejecting a motion to dismiss Title IX claim filed by a male student alleging he was falsely accused of sexual assault).

109.   The conduct of Clifford and/or Denison's employees and/or agents created an unlawfully hostile and/or abusive environment at Denison for male students like John Doe in part because this conduct is similar to conduct addressed in the publications referenced in ¶6.

110.   Defendants' conduct irreparably damaging John Doe's "good name, reputation, honor, or integrity" with an unlawful disciplinary proceedings that will "seriously damage [his] standing . . . [and] interfere with later opportunities for higher education and employment." *See, Goss v. Lopez*, 419 U.S. 565, 573-75 (1975).   Evidence of this damage is described in part in the publications referenced in ¶6.

## JURISDICTION, VENUE

111.   Denison is an educational institution formed under the laws of the State of Ohio, located in Granville, Ohio.

112.  This Court and the United States District Court for the Southern District of Ohio have concurrent jurisdiction over John Doe's Title IX claims.  *See e.g., Thein v. Feather River Community College,* 2008 U.S. Dist. LEXIS 108357, 2008 WL 2783172 *6 (E.D.Cal.2008)(discussing concurrent state and federal court jurisdiction over Title IX claims); *Fortune ex rel. Fortune v. City of Detroit Public Schools,* 2004 Mich. App. LEXIS 2660, 2004 WL 2291333 (Mich.App.2004)(same); *Morrison v. Northern Essex Community College,* 56 Mass. App. Ct. 784, 780 N.E.2d 132, 136 n.9 (Mass.App.2002)(same); *H.M. v. Jefferson County Bd. of Educ.,* 719 So.2d 793, 796 (Ala.1998)(same); *Mosley v. Beaumont Indep. Sch. Dist.,* 997 S.W.2d 934, 938 (Tex.Ct.App.1999)(same).

113.  This Court and the United States District Court for the Southern District of Ohio have personal jurisdiction over Defendants on the grounds that Denison is conducting business within the State of Ohio, Clifford also conducts business and resides in the State of Ohio and Jane Doe resides in Ohio.

114.  Venue for this action properly lies in this Court.  In the alternative, venue rests with the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in its judicial district.

115.  If this Court determines it lacks jurisdiction over the Counts advanced in John Doe's Complaint, John Doe requests this case be transferred and/or removed to the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. §1441.

## <u>Count 1</u>
## <u>Defamation Per Se by Defendant Jane Doe</u>

116.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

117.    Jane Doe orally, and in writing, defamed John Doe by falsely alleging to Denison employees, Denison students, and/or yet to be identified third-parties, that John Doe sexually assaulted Jane Doe on or about February 14, 2015 (collectively referred to as "Jane Doe's Allegations").

118.    Upon information and belief, Jane Doe published Jane Doe's Allegations to Denison employees, Denison Students, and/or other third-parties not involved in Denison's disciplinary proceeding against John Doe.

119.    Jane Doe's Assault Allegations were made with the intent to be understood by those that received the allegations that John Doe committed an offense involving moral turpitude that subjected John Doe to potential infamous punishment and therefore imputes the defamatory character of the oral and written statements.

120.    Jane Doe's Assault Allegations were false and defamatory and were made with actual malice motivated by ill will, intent to deceive, improper motive, and/or an affirmative act to injure John Doe and/or reckless disregard for the truth or falsity of the oral and/or written statements.

121.    In the alternative, Jane Doe negligently published Jane Doe's Assault Allegations.

122.    Jane Doe acted with the knowledge of the falsity of Jane Doe's Assault Allegations and with the intent to harm John Doe's standing with Denison, his future educational and employment opportunities, and his standing and reputation at Denison and and/or in the community at large.

123. As a direct result of Jane Doe's Assault Allegations, the character and reputation of John Doe at Denison and in the community at large was impaired and he suffered and will continue to suffer mental anguish, personal humiliation, and a great loss of reputation.

124. As a further direct and proximate cause of Jane Doe's Assault Allegations, John Doe was unlawfully disciplined and expelled by Denison, which has or will result in, among other consequences and damages, difficulty in gaining entrance to another university comparable to Denison, reduced future earning capacity, and attorneys' fees.

## Count 2
## Intentional Infliction of Emotional Distress by Defendant Jane Doe

125. John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

126. When engaged in the conduct detailed above, Jane Doe knew or should have known Jane Doe's Assault Allegations would cause John Doe to suffer serious emotional injury, mental anguish, and/or a great loss of reputation.

127. Jane Doe's conduct detailed above exhibited an intentional, reckless, and/or deliberate disregard of the high degree of probability that John Doe would suffer immediate and continuing emotional distress.

128. Jane Doe's conduct detailed above caused John Doe to suffer profound and ongoing psychological and mental anguish.

129. Jane Doe's conduct detailed above was malicious, willful and/or intentional.

130. As a direct and proximate result of Jane Doe's aforesaid conduct, John Doe has suffered and will continue to suffer, severe and extreme emotional distress.

36

WHEREFORE, regarding Counts 1-2, John Doe demands judgment and relief against Jane Doe as follows:

A.      Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by Jane Doe's conduct;

B.      Judgment for attorneys' fees;

C.      Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

D.      Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

E.      Such other and further relief as this court may deem just, proper, equitable, and appropriate.

### Count 3
### Breach of Contract By Defendants Denison and Clifford

131.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

132.    John Doe applied to and enrolled at Denison and, with the assistance of his parents, paid tuition and other fees and expenses. John Doe did so in reliance on the understanding, and with the reasonable expectations, among others, that: (a) Denison would implement and enforce Denison Policies include the CSC in *Exhibit 11;* and that (b) Denison Policies would comply with the requirements of applicable law, including Title IX and VAWA.

133.    Upon information and belief, Denison and Clifford entered into a contract to investigate issues related to Jane Doe's Allegations.   ("Clifford/Denison Contract").   The Clifford/Denison Contract *may* be the *unverified*, *unsigned*, and apparent *draft* document

37

Clifford attached to her Motion To dismiss ("Alleged CDC")[5] which is attached to this Complaint as *Exhibit 42*.  But, since both Denison and Clifford are yet to file Answers in this case, John Doe cannot be sure if: (a) the Alleged CDC is the Clifford/Denison Contract; or (b) if the Clifford/Denison Contract is an oral contract which cannot be attached to this Complaint because of its oral nature.  However, if the Alleged CDC contains the terms of Denison's contractual agreement with Clifford, Denison violated Denison's Policies by employing Clifford to adjudicate John Doe's guilt or innocence since Denison's Policies mandate this adjudication be made by a hearing panel of Denison employees and/or students.

134.  John Doe is a third-party beneficiary to the Clifford/Denison Contract.

135.  Denison Policies create an express contract or, alternatively, a contract implied in law or in fact, between Denison and John Doe.  Denison and/or Clifford violated these contracts by engaging in the conduct detailed in this Complaint.

136.  Denison and/or Clifford violated Denison's Policies and/or the Clifford/Denison Contract in part by failing to honor the following OCR directives which Denison's Policies explicitly and/or implicitly incorporate and/or embrace:

---

[5] *See, Docket 7,* PageId.1138-40 (containing Alleged CDC). In addition to being unsigned, the Alleged CDC contains information that suggest it is merely a draft. For example, in the "Relation of Parties" section it states "[next section, if sole proprietor or consultant – may leave it as Contractor is responsible, where necessary, to secure at his/its sole cost, worker's compensation insurance, disability benefits insurance, and any other insurance as may be required by law [depends if we include]." *Id.* (brackets in original).  Other "draft" language include a sentence that reads: "Each party shall maintain in full force and effect any and all licenses of it by law [may not be needed]." ]." *Id.* (brackets in original). Similarly, the "Miscellaneous" section states:  " . . . . venue for any action to enforce this agreement shall be in the Franklin County Court of Common Please (or consider Licking County)." *Id.*  And, the "Notice" section contains the following comment: "(NOTE-I have indicated email or fax with confirmation of receipt by the receiving party shall constitute written notice)." *Id.*  Finally, Clifford appears to admit neither she nor Denison wanted to be bound by the Alleged CDC.  This is because Clifford points out how the Alleged CDC states: "*[n]o change, modification, or waiver about any term of this agreement shall be valid unless it is in writing and signed by both parties.*" *Id.,* p.1131 (all emphasis in original).

a) "Public and state-supported schools must provide due process to the alleged perpetrator" *U.S. Dep*'t Of Education Office of Civil Rights, *Dear Colleague Letter,* (Apr. 4. 2011); http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html

b) Denison and/or Clifford must employ "[p]rocedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions." *U.S. Dep*'t Of Education Office of Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties* (Jan. 2001); http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf; and

*c)* "Investigations must be adequate, reliable and impartial, including the opportunity for both parties to present witnesses and other evidence." *Id.*

137.  Denison and/or Clifford violated Denison's Policies and/or the Clifford/Denison Contract in part by denying John Doe to opportunity to question witnesses, including Jane Doe, even though: (a) these witnesses provided testimony to UCB#1 and UCB#2; and (b) the CSC gave John Doe the right to question witnesses.  *See generally, Exhibits 11-12.*

138.  Denison and/or Clifford's unlawful and/or gender biased conduct detailed in this Complaint evidences their repeated and material breaches of Denison Policies as well as a breach of the implied covenant of good faith and fair dealing inherent in Denison's Policies and/or the Clifford/Denison Contract.

139.  During all times relevant to this Complaint, John Doe did all, or substantially all, of the significant things that Denison Policies and/or the Clifford/Denison Contract required John Doe do.

140.  Denison and/or Clifford's aforementioned breaches of Denison's Policies and/or the Clifford/Denison Contract were wrongful, without lawful justification or excuse. As a direct and foreseeable result of these breaches of contract, John Doe has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to:

mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**Count 4**
**Promissory Estoppel By Defendants Denison and Clifford**
(in the alternative to Count 3's Breach of Contract Claim)

141.　John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

142.　Clifford and/or Denison's employees and/or agents made various promises to John Doe regarding how Denison would adjudicate allegations of sexual misconduct against John Doe. These promises include, but are not limited to, promises outlined in Denison Policies (collectively referred to as "Student's Rights Promises").

143.　Because of the power and authority of Clifford and/or Denison's employees and/or agents, and the relative lack of power of John Doe, John Doe relied upon Clifford and/or Denison's employees and/or agents' statements that John Doe's Student's Rights Promises would be honored.

144.　John Doe reasonably relied on Student's Rights Promises in accepting Denison's offer of admission and incurring the cost of tuition and related expenses to attending Denison.

145.　As detailed above, John Doe relied to his detriment on the Student's Rights Promises and this reliance created the environment that allowed Denison's unlawful discipline of John Doe.

146.　Injustice can only be avoided by enforcement of the Student's Rights Promises made to John Doe.

40

147.  As a direct and foreseeable result of the breach of the Student's Rights Promises, John Doe sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**Count 5**
**Negligence By Defendants Denison and Clifford**
(in the alternative to Count 3's Breach of Contract Claim and
Count 4's Promissory Estoppel claim)

148.  John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

149.  Having put in place a student disciplinary process based in part on Denison Policies and Title IX, Denison owed a duty of care to John Doe to conduct that process in a non-negligent manner and with due care.

150.  Clifford and/or Denison's employees and/or agents owed John Doe a duty not to engage in the unlawful and/or gender biased conduct detailed in this Complaint.

151.  As detailed in this Complaint, Clifford and/or Denison's employees and/or agents' conduct, fell below the applicable standard of care and breached these duties of care.

152.  Clifford and/or Denison's employees and/or agents' breaches of the duty of due care caused John Doe, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

WHEREFORE, regarding Counts 3-5, John Doe demands judgment and relief against Denison and/or Clifford as follows:

A.      Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

B.      Order(s) requiring Denison expunge John Doe's official Denison files of all information related to his interactions with Jane Doe;

C.      Judgment for attorneys' fees, pursuant any applicable statute;

D.      Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

E.      Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

F.      Such other and further relief as this court may deem just, proper, equitable, and appropriate.


**Count 6:**
**Violation of Title IX –Hostile environment and/or discrimination by Denison**

153.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

154.    Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

155.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's

"education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

156. Denison receives federal financial assistance and is thus subject to Title IX.

157. Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

158. Title IX mandates Denison afford equitable procedures and due process to John Doe which includes, but is not limited to:  (a) having proper jurisdictional authority to conduct an investigation; (b) providing adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses, and other evidence, (c) that Denison employees involved in the conduct of the procedures have adequate training, and/or that John Doe have right to not just an advisor, but an attorney.

159. Denison knew, or in the exercise of due care should have known, that Denison lacked jurisdiction under Denison Policies and/or Title IX to investigate and/or discipline John Doe for a physical encounter initiated by Jane Doe when she was not incapacitated.

160. Upon information and belief, Denison knew, or in the exercise of due care should have known, Denison employees including, but not limited to, Weinberg, Kennedy, Gauger, UCB#1, UCB#2, UAB, and/or Clifford lacked training and ability to carry out their responsibilities under the disciplinary enforcement requirements of Title IX.

161.  Upon information and belief, Denison knew, or in the exercise of due care should have known, Denison employees and/or agents including, but not limited to, Weinberg, Kennedy, Gauger, UCB#1, UCB # 2, UAB, and/or Clifford held unlawful bias which motivated their decisions regarding John Doe.

162.  Denison's Policies fail to meet the standards required by Title IX and/or the mandated due process safeguards in the United States Constitution (and) fail to reflect the acceptable established customs and practices of institutions of higher education in disciplinary proceedings regarding allegations of sexual assault.

163.  Upon information and belief, in virtually all cases of campus sexual misconduct by Denison students, the accused student is male and the accusing student is female.

164.  Denison has created an environment in which male students accused of sexual assault, such as John Doe, are fundamentally denied due process as to be virtually assured of a finding of responsibility. Such a biased and one-sided process deprives male Denison students like John Doe of educational opportunities on the basis of sex.

165.  Upon information and belief,  Denison's investigation and/or discipline of John Doe was taken in order to demonstrate to DOE/OCR, President Obama's Administration, and/or the general public that Denison is aggressively disciplining male students accused of sexual assault. Evidence supporting this belief includes, but is not limited to: (a) *Exhibit 13* which contains Kennedy's open letter to the Denison community posted two weeks before the DOE/OCR announcement that Denison was one of 56 institutions of higher education under investigation; and (b) *Exhibit 14* which contains Weinberg's open letters to Denison students and his stated commitment to the Culture of Respect "blueprint."

166.  Upon information and belief, Denison has actual or constructive knowledge that Denison's investigation and/or discipline of John Doe posed a persuasive and unreasonable risk of gender discrimination with regard to John Doe and/or a hostile environment based on gender.

167.  Denison's actions and inactions detailed above and below set in motion a series of events that Denison knew, or reasonably should have known, would cause male Denison students, such as John Doe, to suffer unlawful gender discrimination and/or a hostile environment based on gender.

168.  Denison's investigation and/or discipline of John Doe are discriminatory and based upon or motivated by John Doe's male gender.

169.  The gender bias by Denison against John Doe includes, but is not limited to, providing preferential treatment to Jane Doe.  This preferential treatment includes, but is not limited Denison's refusal to discipline Jane Doe for violating Denison's Policies detailed above. Further, while Gauger sent Jane Doe numerous texts expressing sympathy and desire to help Jane Doe, Gauger did not send emails or letters to John Doe similarly expressing sympathy for John Doe's predicament or any desire to help.  *See e.g., Exhibit 19,* pp.5-8

170.  Denison employees, including but not limited to, Kennedy and Weinberg, received actual notice of the fact that Denison's representatives, including but not limited to, UCB#1, UCB#2, UAB, and/or Clifford: (a) violated John Doe's rights under Denison Policies, Title IX, VAWA, FERPA, and/or guidance promulgated by OCR; and/or (b) wrongly found John Doe violated Denison Policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

171.    Denison employees and/or agents, including, but not limited to Weinberg, Kennedy, Gauger, UCB#1, UCB#2, UAB, and/or Clifford had the authority to institute corrective measures to remedy: (a) Denison's violations of John Doe's rights under Denison Policies, Title IX, VAWA, and/or guidance promulgated by OCR; and/or (b) Denison's unlawful determination that John Doe violated Denison policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

172.    Denison employees and/or agents, including, but not limited to Weinberg, Kennedy, Gauger, UCB#1, UCB#2, UAB, and/or Clifford exhibited deliberate indifference by refusing to remedy: (a) Denison's violations of John Doe's rights under Denison Policies, Title IX, VAWA, and/or guidance promulgated by OCR; and/or (b) Denison's erroneous determination that John Doe violated Denison policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

173.    Denison's deliberate indifference caused John Doe to suffer a hostile environment and/or discrimination so severe, pervasive or objectively offensive that it deprived John Doe of access to educational opportunities or benefits (and) caused other harms detailed above.

174.    Denison's conduct detailed above involved arbitrary and capricious violations of John Doe's constitutional due process rights and/or Title IX.

175.    Upon information and belief, Denison possesses additional documentation evidencing Denison's unlawful pattern of gender biased decision making which discriminates against male students and/or creates a hostile environment.

176.    Denison's hostile environment and/or discrimination caused John Doe economic and non-economic damages in an amount to be determined at trial.

46

**Count 7:**
**Violation of Title IX – Deliberate Indifference by Denison**

177.  John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

178.  Denison employees and/or agents, including, but not limited to, Weinberg, Kennedy, Gauger, UCB#1, UCB#2, UAB, and/or Clifford acted with deliberate indifference towards John Doe because of his male gender.

179.  Denison employees, including, but not limited to, Weinberg and Kennedy, received actual notice of the fact that Denison's representatives, including but not limited to, UCB#1, UCB#2, UAB, and/or Clifford: (a) violated John Doe's rights under Denison Policies, Title IX, VAWA, and/or guidance promulgated by OCR; and/or (b) wrongly found John Doe violated Denison policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

180.  Denison employees and/or agents, including, but not limited to, Weinberg, Kennedy, Gauger, UCB#1, UCB#2, UAB, and or Clifford had the authority to institute corrective measures to remedy: (a) Denison's violations of John Doe' rights under Denison's policies, Title IX, VAWA, and/or guidance promulgated by OCR; and/or (b) Denison's erroneous determination that John Doe violated Denison's policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

181.  Denison employees and/or agents, including, but not limited to, Weinberg, Kennedy, Gauger, UCB#1, UCB#2, UAB, and/or Clifford exhibited deliberate indifference by refusing to remedy: (a) Denison's violations of John Doe's rights under Denison Policies, Title IX, VAWA, and/or guidance promulgated by OCR; and/or (b) Denison's erroneous

determination that John Doe violated Denison policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

182.  Upon information and belief, Denison possesses communications evidencing its employees and/or agents' gender based deliberate indifference towards John Doe and/or other similarly situated male students.

183.  Denison's deliberate indifference caused John Doe economic and non-economic damages in an amount to be determined at trial.

<u>**Count 8**</u>
<u>**Violation of Title IX – Erroneous Outcome by Denison**</u>
(in the alternative to Plaintiff's claims against Denison in: (a) Count 3's Breach of Contract Claim; (b) Count 4's Promissory Estoppel claim; and (c) Count 5's Negligence Claim)

184.  John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

185.  By expelling John Doe, Denison violated Denison Policies, Title IX, VAWA, and/or guidance promulgated by OCR.

186.  Denison employees, including, but not limited to, Weinberg and Kennedy, received actual notice of the fact that Denison's representatives, including but not limited to, UCB#1, UCB#2, UAB, and/or Clifford: (a) violated John Doe's rights under Denison Policies, Title IX, VAWA, and/or guidance promulgated by OCR; and/or (b) wrongly found John Doe violated Denison policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

187.  Denison employees and/or agents, including, but not limited to, Weinberg, Kennedy, Gauger, UCB#1, UCB#2, UAB, and/or Clifford had the authority to institute corrective measures to remedy: (a) Denison's violations of John Doe's rights under Denison Policies,

Title IX, VAWA, and/or guidance promulgated by OCR; and/or (b) Denison's erroneous determination that John Doe violated Denison policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

188. Denison employees and/or agents, including, but not limited to, Weinberg, Kennedy, Gauger, UCB#1, UCB#2, UAB, and/or Clifford exhibited deliberate indifference by refusing to remedy: (a) Denison's violations of John Doe's rights under Denison Policies, Title IX, VAWA, and/or guidance promulgated by OCR; and/or (b) Denison's erroneous determination that John Doe violated Denison policies which Denison adopted pursuant to federal laws and regulations related to Title IX.

189. Upon information and belief, Denison possesses communications evidencing Denison's and or Clifford's deliberate indifference in imposing unlawful discipline on John Doe on the basis of his gender.

190. Denison's wrongful discipline of John Doe caused John Doe economic and non-economic damages in an amount to be determined at trial.

WHEREFORE, regarding Counts 6-8, John Doe demands judgment and relief against Denison as follows:

A. Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

B. Order(s) requiring Denison expunge John Doe's official Denison files of all information related to his interactions with Jane Doe;

C. Judgment for attorneys' fees, pursuant any applicable statute;

49

D.      Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

E.      Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

F.      Such other and further relief as this court may deem just, proper, equitable, and appropriate.

### Count 9
### Unjust Enrichment – By Denison

191.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

192.    Denison received payments from John Doe for various items and services, including but not limited to tuition, board, books, and activities fees ("John Doe's Payments")

193.    Denison at all times knew it was receiving the benefit of John Doe's Payments and did in fact receive the benefit therefrom.

194.    Because of Denison's conduct detailed above, John Doe is now obligated to repay student loans incurred as a result of John Doe's Payments which Denison University knew he would incur to attend and enroll at Denison.  *See e.g., Exhibit 38* (containing John Doe's letter of award from Denison).

195.    Denison's retention of John Doe's Payments would be unjust.

WHEREFORE, regarding Counts 9, John Doe demands judgment and relief against Denison as follows:

A.      Denison's reimbursement of John Doe's Payments;

B.      Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

C.    Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

D.    Such other and further relief as this court may deem just, proper, equitable, and appropriate.

## Count 10
## Injunctive Relief –against Denison

196.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

197.    Based on the facts articulated above, John Doe is entitled to injunctive relief because Denison's discipline of John Doe is unlawful and violates John Doe' rights under Denison's Policies, federal, and/or state laws.

198.    Denison's unlawful discipline of John Doe will cause irreparable harm which is certain, great, actual and not theoretical. *See e.g., Supra, ¶6* (containing citations to publications detailing harm experienced by male students who are falsely accused of sexual misconduct.

199.    Denison's unlawful discipline of John Doe cannot be remedied by an award of monetary damages because of difficulty or uncertainty in proof or calculation.

200.    Based on the facts articulated above, John Doe is entitled to injunctive relief which includes, but is not limited to an Order requiring Denison expunge John Doe's official Denison files of all information related to his interactions with Jane Doe.

201.    The granting of injunctive relief will cause no harm to Denison because Denison has no cognizable interest in its unlawful discipline of John Doe.

202.    The granting of an injunctive relief will advance a significant and appreciable public interest by protecting members of the public – like John Doe –from having their fundamental rights threatened by unlawful government action.

WHEREFORE, regarding Count 10 John Doe demands judgment and relief against Denison as follows:

    A.    Order(s) requiring Denison expunge John Doe's official Denison files of all information related to his interactions with Jane Doe;

    B.    Judgment for attorneys' fees, pursuant to any applicable statute;

    C.    Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

    D.    Pre-judgment interest as may be permitted by law and statute; and/or

    E.    Such other and further relief as this court may deem just, proper, equitable, and appropriate.

## Count 11
## Negligent Supervision – By Denison

203.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

204.    Pursuant to either the Clifford/Denison Contract or the Alleged CDC, Denison created a contractual relationship with Clifford which included, but was not limited to, obligating Clifford to investigate and/or adjudicate Jane Doe's allegations against John Doe pursuant to Denison's Policies.

205.    As detailed above, Clifford acted unlawfully and/or incompetently with regard to her obligation to investigate and/or adjudicate Jane Doe's allegations against John Doe pursuant to Denison's Policies.

206.    As detailed above, John Doe put Denison on actual or constructive notice of Clifford's unlawful and/or incompetent actions with regard to Clifford/Denison Contract or the Alleged CDC.

207.  As detailed above, Clifford's unlawful and/or incompetent acts and/or omissions with regard to Clifford/Denison Contract or the Alleged CDC caused John Doe irreparable damages.

208.  As detailed above, Denison's negligence in hiring, retaining, training, and/or supervising of Clifford caused John Doe irreparable damages.

WHEREFORE, regarding Count 11 John Doe demands judgment and relief against Denison as follows:

A.  Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

B.  Order(s) requiring Denison expunge John Doe's official Denison files of all information related to his interactions with Jane Doe;

C.  Judgment for attorneys' fees, pursuant any applicable statute;

D.  Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

E.  Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

F.  Such other and further relief as this court may deem just, proper, equitable, and appropriate.

Respectfully Submitted,


/s/ Eric J. Rosenberg
Eric J. Rosenberg (0069958)
Rosenberg & Ball Co. LPA.
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
866.498.0811 fax
Eric.rblaw@gmail.com


/s/ Ellen L. Foell
Ellen L. Foell (0016382)
Rosenberg & Ball Co. LPA.
395 North Pearl Street
Granville, Ohio 43023
614.302.3664 phone
866.498.0811 fax
Ellen.rblaw@gmail.com


## JURY DEMAND

John Doe hereby demands a trial by a jury in this matter.


/s/ Eric J. Rosenberg
Eric J. Rosenberg (0069958)

<u>**CERTIFICATE OF SERVICE**</u>

A copy of the foregoing was electronically filed with the Court and served via the CM/ECF system and/or U.S. mail and/or email upon the following on the 21st day of June 2016:

Joshua S. Berger
The Berger Law Firm
P.O. Box 22421
Beachwood, OH 44122
*Attorney for Defendant Jane Doe*

Mary-Kathleen Clifford
1134 Broadview Avenue
Columbus, OH 43212
*Defendant Pro Se*

Robert A. Harris
Kelly Jennings Yeoman
Natalie M. McLaughlin
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH 43215
*Attorney for Defendant Denison University*

*/s/ Eric Rosenberg*
Eric J. Rosenberg (Ohio Bar #0069958)

55